GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 112
25 Market Street
Trenton, New Jersey 08625-0112
Attorney for Defendants
  State of New Jersey
  New Jersey Board of Public Utilities

By:   Deborah A. Hay
      Deputy Attorney General
      (609) 376-3367
      Deborah.Hay@law.njoag.gov

      Daveon M. Gilchrist
      Deputy Attorney General
      (609) 376-2958
      Daveon.Gilchrist@law.njoag.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF TRENTON

| | |
|---|---|
| SUSANNE LAFRANKIE-PRINCIPATO,<br><br>Plaintiff,<br><br>v.<br><br>NEW JERSEY BOARD OF PUBLIC UTILITIES; STATE OF NEW JERSEY; and JOHN DOES 1-5 AND 6-10,<br><br>Defendants. | Hon. Freda L. Wolfson, U.S.D.J.<br>Hon. Zahid N. Quaraishi, U.S.M.J.<br><br>Civil Action No.<br>3:18-cv-02258-FLW-ZNQ<br><br>**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Defendants, State of New Jersey ("SONJ") and the New Jersey Board of Public Utilities "BPU") submit this Statement of Uncontested Material Facts ("SOUMF") in support of its Motion for Summary Judgment. The references are: "Gilchrist Cert." refers to the Certification of Daveon

1

M. Gilchrist; "Reinert Cert." refers to the Certification of John Reinert; and "Covie Cert." refers to the Certification of Cynthia Covie.

1. Plaintiff Susanne LaFrankie-Principato, was hired as a Public Information officer with the Division of Communications on June 25, 2016. (*See* Gilchrist Cert., Ex. A; Covie Cert., ¶3); Reinert Cert., ¶2.)

2. Plaintiff was terminated on September 15, 2017, after concerns regarding her work performance, referencing the lack of attention to detail in her press releases, false timesheet entries, and overall lack of trust in her abilities to meet the expectations of the position. (*See* ; Covie Cert., ¶36); Reinert Cert., ¶19.)

3. Plaintiff then filed a Complaint in Superior Court of New Jersey –Mercer Vicinage on January 5, 2018 alleging the following:

- Count I: Interference Under the New Jersey Family Leave Act ("FLA);

- Count II: Interference Under the federal Family and Medical Leave Act ("FMLA"); and

- Count III: Request for Equitable Relief. (*See* Gilchrist Cert., Ex. A).

**Plaintiff Did Not Demonstrate The Skill, Attention to Detail, and Quality of Work Necessary to Serve as a Public Information Officer:**

4. New Jersey Civil Service Commission explicitly certified the duties to be performed by the position of Public Information Officer on June 20, 2016. (*See* Covie Cert., ¶12; Reinert Cert., ¶10).

5. The PIO "prepares correspondence related to public information matters and takes proactive measures to arouse the interest and secure the cooperation of civil business professional and other groups interested in the programs of the BPU." (*See* Covie Cert., ¶13; Reinert Cert., ¶11).

6. The PIO also on behalf of the BPU "arranges press, radio, television and magazine interviews and photographing of special events." (*See* Covie Cert., ¶14; Reinert Cert., ¶12).

7. Plaintiff has a Masters of Arts in Business/ Professional Communication from La Salle University, but much of her professional experience has been in the form of an "on air personality or correspondent." (*See* Covie Cert., ¶15; Reinert Cert., ¶13).

8. Prior to her employment with BPU, Plaintiff worked as a General Assignment Reporter for local news station from 1987-1998, Nightly News Correspondent for news network from 2014-2015, and beginning in 2003 right until assuming the position with BPU she worked as an Adjunct Professor as well as a Communication Consultant. (*See* Covie Cert., ¶16; Reinert Cert., ¶14).

9. Plaintiff's work performance did not meet the expectations of the BPU. It was repeatedly reported that Plaintiff's work product often displayed poor attention to detail, and often the press releases she produced did not display a thorough, professional, and coherent viewpoint. The dissatisfaction was expressed on numerous occasions, through in-person conversations and emails. While John "Greg" Reinert, Director of the Communications Division, was on vacation twice during the summer of 2017, Cynthia Covie, Chief of Staff, detailed these issues in the "Communication Division Issues" memo. (*See* Gilchrist Cert., Ex. B at 14:14-25; Gilchrist Cert., Ex. C at 20:17-20; Covie Cert., ¶17; Reinert Cert., ¶16).

10. Furthermore, there were concerns regarding Plaintiff adhering to the "sign-in" procedures set forth in the office. Plaintiff was observed entering false timesheets. She would often indicate an earlier arrival time than the actual time she reported to work. Richard DeRose, Deputy Chief of Staff, personally observed Plaintiff's false reporting and reported it to the Chief of Staff. (*See* Gilchrist Cert., Ex. B at 16:6-10; Covie Cert., ¶17; Reinert Cert., ¶¶16-17).

11. This false reporting continued and became such a source of tension that Ms. Covie chose to call a mandatory meeting with the entire Communications Division to explain the importance of following proper and truthful time reporting policy. They maintained that the policy not only had internal consequences, but personnel ramifications as it could be considered "theft of time." (*See* Gilchrist Cert., Ex. B at 15:6-18; Covie Cert., ¶19; Reinert Cert., ¶16).)

12. The BPU staff verified their concerns regarding Plaintiff's timesheet entries as they retrieved the access data that coordinates with Plaintiff's access card and through the period January 2017-April 2017, there were several entries that contradict the time entries submitted by Plaintiff. (*See* Gilchrist Cert., Ex. B at 16:11-21; Covie Cert., ¶20)

13. After a qualified candidate was identified for this position, President Richard Mroz, Mr. Reinert, and Ms. Covie made the decision to terminate or separate Plaintiff from her unclassified employment. (*See* Gilchrist Cert., Ex. B at 55:18-21; 58:11-16; Gilchrist Cert., Ex. C at 35:12-15; Covie Cert., ¶21; Reinert Cert., ¶18).

14. The decision to separate Plaintiff from her unclassified employment was based solely upon the assessment "that it would be a good thing for [the] division in order to properly carry out the duties of [the] division, and [we] would welcome the opportunity to no longer work with somebody who was not functioning well and presented a host of problems." (*See* Gilchrist Cert., Ex. B at 29:6-25; 30:1-12; 59:6-11; Gilchrist Cert., Ex. C at 37:4-9; 38:2-7; Covie Cert., ¶22; Reinert Cert., ¶19).

**Prior To Plaintiff's Request for Leave under the Family Medical Leave Act, The PBU Decided to Separate Plaintiff And Hire A New Public Information Officer:**

15. The PBU received a recommendation by the Governor's Office for Mr. Peter Peretzman to join the Division of Communications in early 2017, with the understanding that he

4

was highly regarded because of his prior experience working for the New Jersey Business & Industry Association. (*See* Gilchrist Cert., Ex. B at 54:3-23; Covie Cert., ¶23; Reinert Cert., ¶21).

16. Initially, the division considered Mr. Peretzman for the vacant position of confidential assistant. Mr. Peretzman declined the offer. (*See* Gilchrist Cert., Ex. B at 55:5-13; Covie Cert., ¶24; Reinert Cert., ¶21).

17. However, the Division remained interested in having Mr. Peretzman as a member of the staff. Thereafter, during the summer of 2017, President Mroz, Mr. Reinert, and Ms. Covie discussed the option of considering Mr. Peretzman for the position of PIO. (*See* Gilchrist Cert., Ex. B at 55:18-24; Gilchrist Cert., Ex. C at 35:9-15; Covie Cert., ¶25; Reinert Cert., ¶22).

18. The decision was made to offer the position of PIO to Mr. Peretzman, and on Friday, September 8, 2017, he accepted the position. In turn, the Governor's Office granted permission of the hire and the Civil Service Commission began to process the application. (*See* Gilchrist Cert., Ex. B at 56:20-24; Covie Cert., ¶26; Reinert Cert., ¶23).

19. Mr. Peretzman was approved by the Civil Service Commission and hired as a Public Information officer at BPU on Tuesday, September 12, 2007. (*See* Gilchrist Cert., Ex. B at 57:2-13; Covie Cert., ¶27; Reinert Cert., ¶24).

20. The apparent last incident that spurred the decision to terminate Plaintiff, occurred on Tuesday, September 12, 2017, at a BPU public event, one of the BPU Commissioners, Joseph Fiordaliso, complained to Mr. Reinart about a press release written by Plaintiff. Commissioner Fiordaliso was also unhappy that his aide and Mr. Reinert had to expend considerable effort, at the event, to re-do Plaintiff's work. Commissioner Fiordaliso asked for assurances that this would not happen again. (*See* Gilchrist Cert., Ex. B at 38:20-25; 78:3-12; Gilchrist Cert., Ex. C at 38:2-17; Covie Cert., ¶28; Reinert Cert., ¶16).

21. Accordingly, there were several BPU members who knew of Plaintiff's impending separation: The BPU members who were advised of the decision included but not limited to President Mroz, Commissioner Fiordaliso. Mr. Reinert, Mr. DeRose, Ms. Covie, Director of Administration Fehmi Malik and Human Resources representative Raquel Washington. (*See* Gilchrist Cert., Ex. C at 42:22-25; Covie Cert., ¶28; Reinert Cert., ¶31).

**The Decision to Terminate Plaintiff Was Not Related to Any Attempt by the Plaintiff to Exercise Her Rights Under the FMLA and/or FLA:**

22. Defendants had a cordial working relationship with Plaintiff and allowed her accommodations throughout her tenure to care for her son. Plaintiff described the condition as only migraines and only requiring that she adjust her schedule to allow time to be home when arrived from school. (*See* Gilchrist Cert., Ex. D at 26:10-13; 31:13-21).

23. Plaintiff admits that not until 2017, did she mention anything to her supervisor again concerning the health condition of her son. (*See* Gilchrist Cert., Ex. D at 36:11-24).

24. Plaintiff had several friendly working relationships with her peers and they discussed her family life well before her attempt to file FMLA/NJFLA leave. (*See* Gilchrist Cert., Ex. D at 35:1-8; 16-23; 82:13-20; 83:10-19).

25. The only example of animus citing in Plaintiff's testimony is the meeting held by Ms. Covie advising the Division of proper sign-in policy and the importance of following procedure. (*See* Gilchrist Cert., Ex. D at 97:9-25).

26. In fact, Plaintiff testimony shows that she held animus towards Ms. Covie, characterizing her in a number of unpleasant terms. (*See* Gilchrist Cert., Ex. D at 97:1-3; 98:13-17).

27. Plaintiff did not inquire about the FMLA process until on or about September 5, 2017 when she emailed the Human Resources department requesting the FMLA/NJFLA form. (*See* Gilchrist Cert., Ex. D at 27:7-14; 28:1-20).

28. Plaintiff admits that upon obtaining the FMLA application on September 5, 2017 did not indicated that she planned to file leave at that time, it was not until her son was admitted to the emergency room on September 12, 2017 did she decided that she needed to take leave for her son. (*See* Gilchrist Cert., Ex. D at 24:6-9).

29. Plaintiff testified that she never discussed Plaintiff's son's condition while she worked at BPU with Ms. Covie. (*See* Gilchrist Cert., Ex. D at 43:8-12).

30. Plaintiff testified that she had no knowledge that Mr. Reinert, her supervisor, was even apprised of her application for FMLA/NJFLA, she merely speculated that he knew. (*See* Gilchrist Cert., Ex. D at 52:5-12).

31. Plaintiff testified that she on a number of occasions spread the notion of retaliation by Defendants to several of her former colleagues. (*See* Gilchrist Cert., Ex. D at 80:21-25: 81:1-11; 86:22-25; 87:1-5; -13; 31:13-21).

32. On September 14, 2017, Plaintiff planned to work only up until 11:00 am. (*See* Gilchrist Cert., Ex. D at 41:1-9; Covie Cert., ¶30.

33. On that same day, Ms. Raquel Washington informed Ms. Covie that Plaintiff submitted a FMLA application, but did not indicate when such leave would begin. (See, Covie Cert., ¶33.)

34. At approximately 9:45am, Ms. Covie instructed her assistant to inform Plaintiff that she is to meet with Mr. Reinert and herself before leaving for the day, however Plaintiff left

the office without meeting.  (*See* Gilchrist Cert., Ex. C at 46:24-35; 47:1-8; Covie Cert., ¶32; Reinert Cert., ¶27).

35. That meeting, Mr. Reinhart and Ms. Covie planned to sit down with Plaintiff and inform her that she would be terminated.  (*See* Covie Cert., ¶31; Reinert Cert., ¶28).

36. Unsure, when Plaintiff would return, Mr. Reinhart prepared "talking points" for Plaintiff's termination, which I reviewed. We determined that we would call Plaintiff the next day and advise her of the BPU's decision to terminate her employment.  (*See* Gilchrist Cert., Ex. C at 43:9-21; Covie Cert., ¶34; Reinert Cert., ¶29).

37. However, the following day, Plaintiff did report to work.  At that time, she emailed Ms. Washington that she would start her FLMA leave on or about September 18, 2017.  (*See* Gilchrist Cert., Ex. C at 43:9-21; Covie Cert., ¶35; Reinert Cert., ¶30).

38. At or around 9:15 am, Plaintiff attended the meeting with Mr. Reinert, Ms. Washington, Fehmi Malik, Director of the Division of Administration and Ms. Covie where she was advised that her employment would be terminated.  Plaintiff was informed of the reasons for her termination, referencing the lack of attention to detail in her press releases, false timesheet entries, and overall lack of trust in her abilities to meet the expectations of the position.  (*See* Gilchrist Cert., Ex. C at 42:22-25; Gilchrist Cert., Ex. D at 45:2-25; 46:1-16; Covie Cert., ¶36; Reinert Cert., ¶31).

39. There was no mention of Plaintiff's decision to apply for FLMA, other than it would not be processed in light of the termination.  (*See* Gilchrist Cert., Ex. C at 43:1-5; Covie Cert., ¶37).

> GURBIR S. GREWAL
> ATTORNEY GENERAL OF NEW JERSEY

By:    */s/Daveon M. Gilchrist*_____
        Daveon M. Gilchrist
        Deputy Attorney General

DATED: July 29, 2019